# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF WEST VIRGINIA

**DONALD LANE,**
      **Plaintiff,**

**v.**
                               **Civil Action No.  2:09CV137**
                               **(The Honorable John Preston Bailey)**

**MICHAEL J. ASTRUE,**
**Commissioner of Social Security,**
      **Defendant.**

## REPORT AND RECOMMENDATION/OPINION

This is an action for judicial review of the final decision of the defendant Commissioner of the Social Security Administration ("Defendant," and sometimes "the Commissioner") denying the Plaintiff's claim for disability insurance benefits ("DIB") under Title II of the Social Security Act[1]. The matter is awaiting decision on cross motions for summary judgment and has been referred to the undersigned United States Magistrate Judge for submission of proposed findings of fact and recommended disposition. 28 U.S.C. § 636(b)(1)(B); Fed. R. Civ. P. 72(b); L.R. Gen. P. 86.02.

For reasons states in this Opinion/Report& Recommendation, the undersigned recommends this case be remanded to the Commissioner for further proceedings.

## I.  PROCEDURAL HISTORY

Donald Lane ("Plaintiff") filed  applications for DIB on June 18, 2007, and August 29, 2008, both alleging disability since April 1, 2006, due to lumbar degenerative joint disease, and back and

---

[1]In his brief in support of his Motion for Summary Judgment, Plaintiff asserts he filed an application "for a period of disability and Disability Insurance Benefits and a separate application for Supplemental Security Income benefits on June 15, 2007" (Plaintiff's brief at p.  3).  A review of the record shows Plaintiff filed an application for DIB on June 18, 2007, and an application for DIB on August 29, 2008 (R.  117-22, 123-24).  The record contains no application for SSI. Additionally, the ALJ's decision addresses only Plaintiff's DIB claim; therefore, this Court's evaluation of the ALJ's decision is limited to the issue of DIB (R.  10).

leg pain (R. 117-24, 146). Plaintiff's applications were denied at the initial and reconsideration levels (R. 71-72). Plaintiff requested a hearing, which Administrative Law Judge Drew A. Swank ("ALJ") held on January 21, 2009 (R. 20-46). Plaintiff, represented by a paralegal, Amanda Daly, testified on his own behalf (R. 25-41). Also testifying was his treating physician, Dr. Alexander Ambroz (R. 41-46). There was no Vocational Expert testimony. On April 9, 2009, the ALJ entered a decision finding Plaintiff was not disabled (R.10-19). On October 7, 2009, the Appeals Council denied Plaintiff's request for review, making the ALJ's decision the final decision of the Commissioner (R. 1-4).

## II. STATEMENT OF FACTS

On November 16, 2006, Plaintiff was seen by Dr. Langlet for lumbar pain and back pain and was given Flexeril and Darvocet N-100 (R. 199). Dr. Langlet reported Plaintiff had been to see him on June 15, 2006, for back and leg pain and that he did not improve between June and November. Dr. Langlet diagnosed lumbar degenerative joint disease (R. 200).

Dr. Robert F. Webb performed a Disability Determination Examination on Plaintiff on September 26, 2007. Plaintiff reported a history of neck and low back injury in a 1986 automobile accident exacerbated by a fall while roller skating. On exam, Plaintiff had trace ankle edema; good DP pulses; was tender to light palpation over the paralumbar area; had low back pain with 70 degrees straight leg raising on left and 80 degrees on the right; had good ROM of hips; had equal 2+ knee reflexes; ankle reflexes were 2+ on left and 1+ on right; was able to squat 45 degrees; was able to walk on heels and had pain walking on toe; walked with a bit of a waddle; and had mild weakness of his lower extremities (R. 203-204).

He had 80 degrees of hip flexion; 30 degrees of hip abduction; 10 degrees abduction; 20

degrees lateral flexion; 60 degrees flexion and extension; 70 degrees lateral rotation of the cervical spine; 60 degrees flexion; 15 degrees lateral flexion of the lumbar spine; slight limitation in flexion and abduction of shoulders; 60 degrees external rotation of the shoulders; good upper extremity strength; and 130 degrees flexion of his knees (R. 273-275).

October 20, 2007, Dr. Thomas O. Lauderman completed a Physical Residual Functional Capacity ("RFC") Assessment of Plaintiff finding: Plaintiff could occasionally lift 50 pounds; frequently lift 25 pounds; stand and sit about 6 hours out of an 8 hour workday; push or pull unlimited; climb, stoop, kneel, crouch and crawl frequently and balance occasionally; had no manipulative, visual or communicative limitations; and should avoid concentrated exposure to extreme cold and heat and even moderate exposure to machinery hazards and heights. Dr. Lauderman noted Dr. Webb's September 2007 exam and findings. Dr. Lauderman concluded Plaintiff was partially credible because the medical evidence did not substantiate Plaintiff's "allegations to the degree alleged" (R. 207-214).

Plaintiff was seen at City Urgent Care February 1, 2008 for cough, congestion, fever and back pain (R. 215).

Paul F. Kradel, Ed.D., performed a psychological evaluation on Plaintiff on March 10, 2008. WAIS-III valid test results were: Verbal IQ - 75; Performance IQ - 72; and Full Scale IQ - 77. WRAT- 3 valid test results were Reading - 52 (grade level 2); Spelling - 49 (grade level 1); and Arithmetic - 61 (grade level 3). On Axis 1 Plaintiff was diagnosed with Dysthymic (depressed) Disorder and Generalized Anxiety Disorder, and on Axis 3 Plaintiff was diagnosed with obesity and complaints of chronic pain (R.216-219 and 276-277). He opined Plaintiff's prognosis was poor.

On April 1, 2008, State agency physician Dr. Porfirio Pascasio affirmed the October, 2007,

physical functional capacity assessment of Plaintiff as written (R. 222).

On April 2, 2008, State agency reviewing psychologist Philip E. Comer, Ph.D. reviewed Plaintiff's records and filled out a Mental Residual Functional Capacity Assessment (R. 224). He opined that Plaintiff would be moderately limited in his ability to understand, remember, and carry out detailed instruction; maintain attention and concentration for extended periods; perform activities within a schedule, maintain regular attendance and be punctual within customary tolerances; work in coordination with or proximity to others without being distracted by them; complete a normal workday and workweek without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods; interact appropriately with the general public; respond appropriately to changes in the work setting; and set realistic goals or make plans independently of others. He would be "not significantly limited" in all other areas. Dr. Comer concluded that "[c]laimant's functional limitations do not call for a RFC allowance. He appears to have the mental/emotional capacity for simple work like activity in a low stress/demand work environment that has minimal reading/writing/math (claimant is essentially functionally illiterate) and social interaction requirements and that can accommodate his physical limitations."

Dr. Comer also completed a Psychiatric Review Technique ("PRT") of Plaintiff finding Plaintiff had an organic mental disorder (Borderline Intellectual Functioning), affective disorder (depressive disorder), and an anxiety-related disorder consisting of generalized persistent anxiety (R. 228-233). He then opined Plaintiff would have a mild restriction of activities of daily living, moderate difficulties in maintaining social functioning, moderate difficulties in maintaining concentration, persistence or pace, and had one or two episodes of decompensation (R. 238). He found Plaintiff's statements were reasonably consistent with other evidence in the file and are

credible from his perspective (R. 240).

Dr. Porfirio Pascasio reviewed the City Urgent Care record of February 1, 2008, and concluded again that the October 2007 medium physical functional capacity assessment of Dr. Lauderman remained unchanged(R. 242).

Plaintiff was seen at City Hospital on July 27, 2008, primarily to establish a primary care physician relationship. Plaintiff stated he had daily back pain but that this particular day was a very good day for him as he was up and moving about without any problems. X-rays showed "mild degenerative disk disease at L5/S1 but otherwise no acute processes." (The x-ray report noted: "The lumbar spine is anatomically aligned. There is mild narrowing of the disk height at L5/S1. No fracture or compression deformity is seen.") Physical exam of his back revealed "some upper mid and lower lumbar spine tenderness" (R. 253-256).

Dr. Alexander Ambroz examined Plaintiff on August 6, 2008, concluding Plaintiff had "decreased ranges of motion of the lumbar spine . . . pain on straight leg raising . . . . pain on getting on and off the examination table . . . . gait is antalgic ... does need a cane to walk." Dr. Ambroz reported: "[q]uantitative sensory nerve studies done in my office revealed evidence of bilateral pain nerve neuropathy" (R. 243-252).

Dr. Ambroz provided a Medical Assessment of Ability to do Work Related Activities (Physical) for Plaintiff on October 1, 2008. Based on the examination of August 6, Dr. Ambroz opined Plaintiff could lift and carry 5 pounds one-third to two-thirds of an 8 hour day; could not stand or walk more than a couple of minutes at a time for up to 2 hours total in an 8 hour day; could sit for 15 minutes at a time for up to a total of 2 hours during any 8 hour day; could never climb, stoop, kneel, balance, crouch, or crawl; his ability to reach, handle, pull, and push were functions

affected by the alleged impairment; and was not environmentally restricted because of any of his impairments (R. 258-268).

Dr. Ambroz wrote Amanda Dailey, Paralegal, of his intent to attend Plaintiff's hearing before the Administrative Law Judge and of his intent to send a comprehensive report. Attached was the above assessment of Plaintiff's ability to do work related physical activities (R. 286 -311).

Dr. Ambroz of First Priority Medical Clinic saw Plaintiff again on November 11, 2008, for prescription refill and noted back flexion at 35 degrees, extension at 10 degrees, left and right lateral flexion at 15 degrees, pain on straight leg raising in the sitting and supine positions; pain on getting on and off the examination table; and antalgic gait. He diagnosed: "chronic low back pain, obesity, lumbar spine disorder, and pain neuropathy" (R. 282-285).

A physical Residual Functional Capacity Assessment was completed in which a State agency reviewing evaluator, identified only as "frf," opined: "Allegations are not fully supported by medical evidence which indicate review of systems are normal except for pain rating is significant. Claimant statements are not totally credible with questionnaires which indicated constant pain. Claimant's ADL's are significantly restricted which requires assistance with all activities. Claimant considered partially credible" (R. 57)[2]. "FRF" agreed with the ALJ's assessment that Plaintiff was limited to "light RFC with environmental restrictions" (R.58). "FRF" found Plaintiff: could occasionally lift 20 pounds; could frequently lift and carry 10 pounds; could stand or walk with normal breaks for about 6 hours in an 8 hour day; could sit with normal breaks about 6 hours in an 8 hour day; could push and pull unlimited; could occasionally climb ramps/stairs, balance, stoop, kneel, crouch and

---

[2]At some point prior to the document being made a part of the record, Plaintiff apparently made hand lettered notations on the same. Plaintiff noted his disagreement with the statements and findings within the evaluation.

crawl; had no communicative limitations; was unlimited with respect to being exposed to wetness, humidity, noise and fumes, odors, dusts, gases and poor ventilation but should avoid concentrated exposure to extreme cold, extreme heat, vibration and even moderate exposure to hazards of machinery and heights; and had no manipulative or visual limitations (R.58-62).

Progress notes for Plaintiff's treatment at Inwood Family Medicine dated October 16, 2008, show Plaintiff could not stand unassisted; had antalgic lean; had lumbar hyperlordosis; limped; used a cane; had tenderness/restriction at the LS, L4, L5 and coccyx tenderness; had no paraspinal muscle tenderness or paraspinal muscle spasm on either left or right; had left and right sacroiliac joint tenderness; was unable to perform ROM; could not fully squat; and straight leg raising produced right and left side back pain (R.62-66). He was diagnosed with chronic low back pain, hypertension; and morbid obesity with a BMI of 45.8. He needed a doctor who would accept Medicaid.

A progress note signed by Sean P. Rhoads, PA, of Jefferson Urgent Care on August 11, 2009, relayed historical information provided by Plaintiff; noted Plaintiff used a cane, limped, complained of pain in the low back, and was unable to complete seated leg raise and was uncomfortable in performing the gas pedal test. Medications were reviewed. No tests were performed aside from the straight leg and gas pedal tests. Plaintiff refused surgery for his condition. He was prescribed Ibuprofen, Naprosyn, Kelaxin, Darvacet, and Patanase (R.67-70).

At the time of the administrative hearing in January 2009, Plaintiff stood approximately five feet, eight inches tall and weighed 275 lbs or more (R.27). He and his fifteen year old son lived in a home located in Kearneysville, West Virginia. (R.25).

Plaintiff went half way through the 9th grade; did not obtain a GED; and could not read very well, although he did fill out his own initial Social Security claim paperwork with help from his son

(R.26, 38).

Plaintiff had a driver's license and drove his '97 Dodge pickup truck at least once weekly on average a distance of 10-12 miles to go to the grocery store (R. 28). He used a battery powered buggy in the grocery store (R. 39).

Plaintiff had worked in construction, landscaping, masonry, carpentry, painting, grass cutting, and washed dishes (R.26, 30). He had mostly been self-employed, but had not worked for himself or others since June 2006 (R.28).

Plaintiff testified he had back pain from six inches above the top of his backside running down his legs into his feet at level 6.5-7 out of 10. He could carry a gallon of milk (8 lbs); could stand before sitting fifteen minutes; could sit for twenty or more minutes before standing; and could walk to his dog cage and back on his two-acre property with a sit break. (R. 30-31). Plaintiff used a prescribed cane but refused to use a recommended walker (R.31, 40).

Plaintiff complained of left elbow soreness of two years duration and a hernia and bruising in the area of the hernia from hitting himself with a shovel while cleaning out a fire pit before the birth of his son (R.33).

Plaintiff testified he took no medications to help him sleep. He slept for an hour or two before rolling over and waking up. He napped during the day and fell asleep watching television (R. 33). Other than grocery shopping with his son and helping set out packaged meals, Plaintiff did no house cleaning and had no hobbies or outside activities or interests (R.34). The house cleaning was done by his son (R.40). Plaintiff testified he spent most of his day watching television and using a heating pad on his legs, back and stomach (R. 39). He took care of his own personal grooming but had some difficulty due to lack of flexibility in cleaning himself post defecation and putting on socks

and sometimes bathing (R.34).

Plaintiff testified he had not seen a chiropractor since 2006, and had not had any physical therapy for an undisclosed period of time. When asked if any physician had recommended a treatment or surgery that he had refused he responded: "No, I won't have an operation. No, I don't get treated right in the hospital. I won't go" (R.36).

Plaintiff testified he saw a psychiatrist since June 2006, but did not use any prescription drugs to treat depression or anxiety because of his need to be alert for his son (R. 36). Plaintiff stated he did not drink alcohol; did not smoke; used reading glasses to read; had no problems with his hearing; and had no problem with his memory or concentration except he didn't "remember things all the time" (R.37).

Dr. Alexander Ambroz testified he had a speciality interest in Disability and had been doing disability examinations since 1988. He had performed about 16,000 disability examinations since then (R.41). Dr. Ambroz testified he had seen Plaintiff as a patient monthly since August 2008 (five months), primarily for discogenic low back pain (R.41-42). Dr. Ambroz testified Plaintiff's clinical presentation was the same as his hearing presentation: He had difficulty walking, he walked with a cane, he had severe pain, he had decreased ranges of motion of his back, and he had tenderness to palpation. Dr. Ambroz testified Plaintiff should be seeing a pain specialist and a physical therapist and should have an MRI, but could not afford them (R.41-42). He testified that also explained the dearth of medical records. Dr. Ambroz stated Plaintiff had limited activities of daily living. He opined that Plaintiff hadn't undergone adequate treatment or testing because he lacked funds, but that he did perform a sensory nerve conduction study on September 12, 2008, which indicated abnormalities in the pain nerves to both legs. Dr. Ambroz testified he had reviewed Plaintiff's prior

treating physician, Dr. Webb's, records and found they were consistent. Dr. Webb found Plaintiff

had somewhat diminished strength in his legs and decreased joint ranges of motion. Dr. Ambroz

stated Plaintiff had a great deal of difficulty getting on the examining table. He had to help him on

and off the examining table (R.43). He testified Plaintiff also had difficulty walking and difficulty

getting around.

### III. ADMINISTRATIVE LAW JUDGE DECISION

Utilizing the five-step sequential evaluation process prescribed in the Commissioner's

regulations at 20 C.F.R. § 404.1520 (2000), ALJ Swank made the following findings:

1. The claimant meets the insured status requirements of the Social Security Act through March 31, 2010 (R. 12).

2. The claimant has not engaged in substantial gainful activity since June 30, 2006, the alleged onset date (20 CFR 404.1571 *et seq.*) (R. 12).

3. The claimant hasthe following severe impairments: chronic low back pain, polyarthralgias, obesity, dysthemic [sic] disorder, anxiety related disorder and borderline intellectual functioning (20 CFR 404.1521 *et seq.*) (R. 12).

4. The claimant does not have an impairment or combination of impairments that meets or medically equals one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1525 and 404.1526) (R. 13).

5. After careful consideration of the entire record, the undersigned finds that the claimant has the residual functional capacity to perform light work as defined in 20 CFR 404.1567(b). However, the claimant only occasionally may engage in occupations that require postural maneuvers such as balancing, stooping, kneeling, crouching, crawling, and climbing on ramps, ropes, ladders, stairs and scaffolds. The claimant must avoid concentrated exposure to temperature extremes and even moderate exposure to hazards such as machines and heights. Additionally, the claimant lis limited to occupations requiring simple, routine, repetitive tasks only involving simple work-related decisions with few work place changes outside of a fast-paced production environment with only occasional interaction with supervisors, co-workers and the general public (R. 15).

6. The claimant is unable to perform any past relevant work (20 CFR

404.1565) (R. 17).

7.     The claimant was born on June 17, 1962 and was 44 years old, which is defined as a younger individual age 18-49, on the alleged disability onset date (20 CFR 404.1563) (R. 17).

8.     The claimant has a limited education and is able to communicate in English (20 CFR 404.1564) (R. 17).

9.     Transferability of job skills is not material to the determination of disability because applying the Medical-Vocational Rules directly supports a finding of "not disabled," whether or not the claimant has transferable job skills (See SSR 82-41 and 20 CFR Part 404, Subpart P, Appendix 2) (R. 18).

10.     Considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform (20 CFR 404.1569 and 404.1569a) (R. 18).

11.     The claimant has not been under a disability, as defined in the Social Security Act, from June 30, 2006 through the date of this decision (20 CFR 404.1520(g)) (R. 18).

## IV. DISCUSSION

### A. Scope of Review

In reviewing an administrative finding of no disability the scope of review is limited to determining whether "the findings of the Secretary are supported by substantial evidence and whether the correct law was applied." Hays v. Sullivan, 907 F.2d 1453, 1456 (4th Cir. 1990). The Fourth Circuit held, "Our scope of review is specific and narrow. We do not conduct a de novo review of the evidence, and the Secretary's finding of non-disability is to be upheld, even if the court disagrees, so long as it is supported by substantial evidence." Smith v. Schweiker, 795 F.2d 343, 345 (4th Cir.1986). Substantial evidence is "such relevant evidence as a reasonable mind might accept to support a conclusion." Richardson v. Perales, 402 U.S. 389, 401 (1971) (quoting Consolidated

Edison Co. v. NLRB, 305 U.S. 197, 229 (1938)).  Elaborating on this definition, the Fourth Circuit

has stated that substantial evidence "consists of more than a mere scintilla of evidence but may be

somewhat less than a preponderance.  If there is evidence to justify a refusal to direct a verdict were

the case before a jury, then there is 'substantial evidence.'" Hays,  907 F.2d at 1456 (quoting Laws

v. Celebrezze, 368 F.2d 640, 642 (4th Cir. 1968)).  In reviewing the Commissioner's decision, the

reviewing court must also consider whether the ALJ applied the proper standards of law: "A factual

finding by the ALJ is not binding if it was reached by means of an improper standard or

misapplication of the law."  Coffman v. Bowen, 829 F.2d 514, 517 (4th Cir. 1987).

## B.  Contentions of the Parties

Plaintiff contends:

1.      The ALJ should have given controlling weight to the opinion of Dr. Ambroz under SSR 96-2p.

2.      The ALJ failed to evaluate Plaintiff's complaints of pain in accord with 20 C.F.R. 404.1529 and SSR 96-7p.

3.      The ALJ did not fairly and adequately consider whether Plaintiff's medical evidence supported a finding that he met the criteria for muscular skeletal disorders under sections 1.02 and 1.04 of the listings and that he erred by not considering whether Plaintiff's condition was the equivalent of a listed impairment under 20 C.F.R. 404.1526.

The Commissioner contends:

1.      The ALJ weighed Dr.  Ambroz's opinion pursuant to the correct legal standard, and Dr.  Ambroz's opinion was not entitled to controlling weight.

2.      Substantial evidence supports the ALJ's credibility determination.

3.      The ALJ determined that Plaintiff's condition did not satisfy the requirements of any Listing and the ALJ's explanation of his evaluation of the Listings was sufficient for purposes of judicial review.

### C.  Vocational Expert Testimony

Although Plaintiff did not argue the lack of VE testimony at the hearing, the undersigned finds the Court cannot find substantial evidence supports the ALJ's determination due to this omission.  There is no mention of a Vocational Expert in the record.  A vocational expert did not testify at the hearing.  In his decision, the ALJ found Plaintiff had the following severe impairments: chronic low back pain, polyarthralgias, obesity, dysthymic disorder, anxiety related disorder, and borderline intellectual functioning.  A number of these impairments are nonexertional, including the mental impairments and pain.

The ALJ then found Plaintiff's RFC was as follows:

> After careful consideration of the entire record, the undersigned finds that the claimant has the residual functional capacity to perform light work as defined in 20 CFR 404.1567(b).  However, the claimant only occasionally may engage in occupations that require postural maneuvers such as balancing, stooping, kneeling, crouching, crawling, and climbing on ramps, ropes, ladders, stairs and scaffolds.  The claimant must avoid concentrated exposure to temperature extremes and even moderate exposure to hazards such as machines and heights.  Additionally, the claimant is limited to occupations requiring simple, routine, repetitive tasks only involving simple work-related decisions with few work place changes outside of a fast-paced production environment with only occasional interaction with supervisors, co-workers and the general public.

(R.  15).  All of the underlined limitations are considered nonexertional.

At step four the ALJ determined that Plaintiff could not do his past relevant work.  At this point the burden shifted to the Commissioner to show that the Plaintiff, based on his age, education, work experience, and RFC, could perform other substantial gainful work available in significant numbers in the national economy.  20 C.F.R. sections 404.920, 416.920.  The ALJ then found Plaintiff was a younger individual with a limited education, able to communicate in English.  The ALJ then cited Social Security Regulation ("SSR") 83-11, stating:

If the claimant can perform all or substantially all of the exertional demands at a given level of exertion, the medical-vocational rules direct a conclusions of either "disabled" or "not disabled" depending upon the claimant's specific vocational profile.  (R. 18)

.

The ALJ next cited SSR 83-12 and 83-14 for his statement:

When the claimant cannot perform substantially all of the exertional demands of work at a given level of exertion <u>and/or has nonexertional limitations</u>, the medical-vocational rules are used as a framework for decisionmaking unless there is a rule that directs a conclusion of "disabled" without considering the additional exertional and/or nonexertional limitations.

(R. 18)(Emphasis added).

Having found Plaintiff had nonexertional limitations, the ALJ could not rely on the Medical-

Vocational Rules. The Fourth Circuit has long held:

Manifestly, if [Plaintiff] demonstrates the presence of nonexertional impairments, the Secretary, in order to prevail, must be required to prove by expert vocational testimony that, despite [Plaintiff's] combination of nonexertional and exertional impairments, specific jobs exist in the national economy which he can perform.  The grids may satisfy the Secretary's burden of coming forward with evidence as to the availability of jobs the claimant can perform only where the claimant suffers solely from exertional impairments.  To the extent that nonexertional impairments further limit the range of jobs available to the claimant, the grids may not be relied upon to demonstrate the availability of alternative work activities.  Instead, in such cases <u>the Secretary must produce a vocational expert to testify that the particular claimant retains the ability to perform specific jobs which exist in the national economy.</u>

<u>Grant v. Schweiker</u>, 699 F.2d 189 (4th Cir. 1982)(Emphasis added).  For reasons never explained in

the record or the transcript of the Administrative Hearing, no Vocational Expert testified.  For that

reason alone, the undersigned finds the case must be remanded under Fourth Circuit precedent.

Further, instead of hearing VE testimony, the ALJ himself found:

[Plaintiff's] additional limitations have little or no effect on the occupational base of unskilled light work.  A finding of "not disabled" is therefore appropriate under the framework of this rule.  There is no limit to the claimant's upper extremity activities and the claimant reports doing some household chores, other activities of daily living,

driving and automobile, and managing his affairs.

(R. 18). The ALJ himself limited Plaintiff to work with only occasional balancing, stooping, kneeling, crouching, crawling, and climbing on ramps, ropes, ladders, stairs and scaffolds; avoiding concentrated exposure to temperature extremes and even moderate exposure to hazards such as machines and heights; doing only simple, routine, repetitive tasks only involving simple work-related decisions with few work place changes; with no fast-paced production environment; and with only occasional interaction with supervisors, co-workers and the general public. There is no explanation for the ALJ's determination that these limitations "have little or no effect on the occupational base of unskilled light work," and the undersigned finds no support for this determination.

Finally, the ALJ determined:

Considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform (20 CFR 404.1569 and 404.1569a).

(R. 18). The ALJ identifies no such jobs, however.

For all the above reasons, the undersigned finds substantial evidence does not support the ALJ's determination that Plaintiff could perform other jobs that exist in significant numbers in the national economy. Accordingly, on remand, a Vocational Expert must be consulted to determine the effect of Plaintiff's nonexertional limitations on the occupational base.

**D. Dr. Ambroz's Opinion**

Plaintiff argues the ALJ should have given controlling weight to the opinion of Dr. Ambroz under SSR 96-2p. Defendant contends the ALJ weighed Dr. Ambroz's opinion pursuant to the correct legal standard, and Dr. Ambroz's opinion was not entitled to controlling weight.

The Fourth Circuit holds: "Although it is not binding on the Commissioner, a treating

physician's opinion is entitled to great weight and may be disregarded only if persuasive contradictory evidence exists to rebut it." Craig v. Chater, 76 F. 3d 585, 589 (4th Cir. 1996). The treating physician's opinion should be accorded great weight because "it reflects an expert judgment based on a continuing observation of the patient's condition over a prolonged period of time." Mitchell v. Schweiker, 699 F.2d 185 (4th Cir. 1983).

20 C.F.R. § 404.1527 states:

(d) *How we weigh medical opinions*. Regardless of its source, we will evaluate every medical opinion we receive. Unless we give a treating source's opinion controlling weight under paragraph (d)(2) of this section, we consider all of the following factors in deciding the weight we give to any medical opinion

(1) *Examining relationship*. Generally we give more weight to the opinion of a source who has examined you than to the opinion of a source who has not examined you.

(2) *Treatment relationship*. If we find that a treating source's opinion on the issue(s) of the nature and severity of your impairment(s) is well supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in [the] case record, we will give it controlling weight. When we do not give the treating source's opinion controlling weight, we apply the factors listed in paragraphs (d)(2)(i) and (d)(2)(ii) of this section, as well as the factors in paragraphs (d)(3) through (d)(6) of this section in determining the weight to give the opinion. We will always give good reasons in our notice of determination or decision for the weight we give your treating source's opinion.

(i) *Length of the treatment relationship and the frequency of examination*. Generally, the longer a treating source has treated you and the more times you have been seen by a treating source, the more weight we will give to the treating source's medical opinion. When the treating source has seen you a number of times and long enough to have obtained a longitudinal picture of your impairment, we will give the source's opinion more weight than we would give it if it were from a non treating source.

(ii) *Nature and extent of the treatment relationship.* Generally, the more knowledge a

> treating source has about your impairment(s) the more weight we will give to the source's medical opinion. We will look at the treatment the source has provided and at the kinds and extent of examinations and testing the source has performed or ordered from specialists and independent laboratories.
>
> (3) *Supportability*. The more a medical source presents relevant evidence to support an opinion particularly medical signs and laboratory findings, the more weight we will give that opinion. . . .
>
> (4) *Consistency*. Generally, the more consistent an opinion is with the record as a whole, the more weight we will give to that opinion.

(Emphasis added).

The ALJ's opinion does not state what weight he accorded Dr. Ambroz's opinion; however, he clearly did not accord it controlling weight, and clearly accorded it little to no weight. The ALJ correctly states that the treating physicians' opinions that Plaintiff is disabled are "not a determinations reserved for the Commissioner." 20 CFR 404.1527 provides:

> (e) *Medical source opinions on issues reserved to the Commissioner.* Opinions on some issues, such as the examples that follow, are not medical opinions, as described in paragraph (a)(2) of this section, but are, instead, opinions on issues reserved to the Commissioner because they are administrative findings that are dispositive of a case; *i.e.,* that would direct the determination or decision of disability.
>
> (1) *Opinions that you are disabled.* We are responsible for making the determination or decision about whether you meet the statutory definition of disability. In so doing, we review all of the medical findings and other evidence that support a medical source's statement that you are disabled. A statement by a medical source that you are "disabled" or "unable to work" does not mean that we will determine that you are disabled.
>
> (2) *Other opinions on issues reserved to the Commissioner.* We use medical sources, including your treating source, to provide evidence, including opinions, on the nature and severity of your impairment(s). Although we consider opinions from medical sources on issues such as whether your impairment(s) meets or equals the requirements of any impairment(s) in the Listing of Impairments in appendix 1 to this subpart, your residual functional capacity (see §§404.1545 and

404.1546), or the application of vocational factors, the final responsibility for deciding these issues is reserved to the Commissioner.

Therefore Dr. Ambroz's opinion that Plaintiff would not be able to work is not entitled to controlling weight. Dr. Ambroz testified to much more than whether Plaintiff was disabled or would be unable to work, however. Dr. Ambroz testified under oath that Plaintiff had difficulty walking, walked with a cane, had severe pain, had decreased range of motion of the back, and had tenderness to palpation. He testified Plaintiff's main problem was "severe discogenic low back pain." He testified he had performed a sensory nerve conduction study which indicated abnormalities in the pain nerves to both legs.. He testified Plaintiff was very limited in his activities of daily living and could not get around much. He testified Plaintiff had a great deal of pain and difficulty getting on the examining table. He had been prescribing Plaintiff Darvocet and other medications.

The undersigned finds that Dr. Ambroz is a treating physician, even if not for an overly lengthy time. The ALJ's discussion of the weight he accorded Dr. Ambroz consists of the following:

Dr. Ambroz [sic] testimony was based largely on the self reporting of the claimant with claims that the claimant has been unable to pay for diagnostic studies. . . . The sole diagnostic image in the file indicates nothing more than mild degenerative disc disease at L5/S1, with no acute processes. At that emergency department visit on July 29, 2008, all systems were completely within normal limits. The results of the diagnostic images does not support a finding of disabled . . .

In sum, the above residual functional capacity assessment is supported by the claimant's testimony indicating his abilities regarding activities of daily living, his abilities in completing the forms and his conservative treatment for his impairments. The record is devoid to the necessary clinical and laboratory findings to support greater limitations. The forms, notes, and passionate testimony of Dr. Ambroz are insufficient to find the claimant is incapable of sustaining competitive employment.

Pursuant to SSR 96-2p:

Adjudicators must remember that a finding that a treating source medical opinion is not well-supported by medically acceptable clinical and laboratory diagnostic

18

techniques or is inconsistent with the other substantial evidence in the case record means only that the opinion is not entitled to "controlling weight," not that the opinion should be rejected. Treating source medical opinions are still entitled to deference and must be weighed using all of the factors provided in 20 CFR 404.1527 and 416.927.

The undersigned finds the ALJ did not weigh Dr. Ambroz's medical opinions using all of the factors provided in the Regulations. Substantial evidence therefore does not support the ALJ's assessment of Dr. Ambroz's opinions.

### E. Credibility Evaluation

Plaintiff next argues the ALJ failed to evaluate his complaints of pain in accord with 20 C.F.R. 404.1529 and SSR 96-7p. Defendant contends substantial evidence supports the ALJ's credibility determination. The Fourth Circuit has developed a two-step process for determination of whether a person is disabled by pain or other symptoms as announced in <u>Craig v. Chater</u>, 76 F. 3d 585 (4th Cir. 1996):

1) For pain to be found to be disabling, there must be shown a medically determinable impairment which could reasonably be expected to cause not just pain, or some pain, or pain of some kind or severity, but *the pain the claimant alleges she suffers*. The regulation thus requires at the threshold a showing by objective evidence of the existence of a medical impairment "which could reasonably be expected to produce the actual pain, in the amount and degree, alleged by the claimant." *Cf. Jenkins*, 906 F.2d at 108 (explaining that 42 U.S.C. § 423(d)(5)(A) requires "objective medical evidence of some condition that could reasonably be expected to produce the pain alleged"). *Foster*, 780 F.2d at 1129 . . . .

2) It is only after a claimant has met her threshold obligation of showing by objective medical evidence a medical impairment reasonably likely to cause the pain claimed, *that the intensity and persistence of the claimant's pain, and the extent to which it affects her ability to work, must be evaluated*, *See* 20 C.F.R. §§ 416.929(c)(1) & 404.1529(c)(1). Under the regulations, this evaluation must take into account not only the claimant's statements about her pain, but also "all the available evidence," including the claimant's medical history, medical signs, and laboratory findings, *see id.;* any objective medical evidence of pain (such as evidence of reduced joint motion, muscle spasms, deteriorating tissues, redness, etc.). *See* 20 C.F.R. §§

416.929(c)(2) & 404.1529(c)(2); and any other evidence relevant to the severity of the impairment, such as evidence of the claimant's daily activities, specific descriptions of the pain, and any medical treatment taken to alleviate it. *See* 20 C.F.R. § 416.929(c)(3) & 404.1529(c)(3). (Emphasis added).

Craig, supra at 594. The ALJ here found Plaintiff met the first (threshold) step. He was therefore required to evaluate the intensity and persistence of Plaintiff's symptoms taking into account "all the available evidence." The undersigned finds the ALJ did consider the medical history, signs, and laboratory findings (and, more significantly, the dearth of same). In describing his daily activities, however, the ALJ states only that he "is able to sufficiently ambulate to shop, prepares meals and care for himself and to some degree his son." In one sentence the ALJ notes Plaintiff testified there were some activities with which his son must assist, and in the same paragraph notes Plaintiff testified about "the extensive help that his son provides." In fact, Plaintiff testified that his son went shopping with him while Plaintiff rode in an electric buggy. He prepared TV dinners and sandwiches for meals, with help from his son, by bringing "the stuff out" and sitting down and doing it. He also testified that he had difficulties putting on his socks "when he wore them" (he usually did not); sometimes getting his pants up; and "cleaning himself after toileting" (the ALJ's word). In what to the undersigned appears to be a inconsistent finding, the ALJ noted that Plaintiff said he had no friends or family "but did not indicate any limitations with his abilities of social functioning beyond the absence of friends and family."

Most significantly, the undersigned finds the ALJ's credibility analysis makes no mention of the effects of Plaintiff's diagnosed morbid obesity, his IQ of 72, his diagnosed dysthymic disorder or anxiety disorder, beyond mentioning the diagnoses. In particular, SSR 02-1p, regarding obesity, states that the ALJ must consider obesity at every step after the first in the sequential evaluation process. "The combined effects of obesity with other impairments may be greater than might be

expected without obesity. For example, someone with obesity and arthritis affecting a weight-bearing joint may have more pain and limitation than might be expected from the arthritis alone." Significantly, Plaintiff's BMI of 45.8 places him in the highest level, Level II, "termed 'extreme' obesity and representing the greatest risk for developing obesity-related impairments." This is not to say that Plaintiff's obesity is a disabling impairment or even that it is partly disabling, only that the ALJ did not expressly consider it in his credibility finding, as required by the Regulations, Rulings, and case law.

Upon consideration of all of the above, the undersigned finds substantial evidence does not support the ALJ's credibility determination.

### F. Listings 1.02 and 1.04.

Plaintiff argues that the ALJ did not fairly and adequately consider whether the medical evidence supported a finding that he met the criteria for muscular skeletal disorders under sections 1.02 and 1.04 of the listings and that he erred by not considering whether Plaintiff's condition was the equivalent of a listed impairment under 20 C.F.R. 404.1526. Defendant contends that the ALJ determined that Plaintiff's condition did not satisfy the requirements of any Listing and the ALJ's explanation of his evaluation of the Listings was sufficient for purposes of judicial review.

A review of the decision shows the ALJ did properly evaluate Plaintiff's back impairment under the Listings. Plaintiff did not have the evidence of major dysfunction of a joint characterized by gross anatomical deformity to meet listing 1.02. He also did not have evidence of nerve root compression, spinal arachnoiditis, or lumbar spinal stenosis resulting in pseudoclaudication to meet Listing 1.04.

A review of the decision shows that the ALJ did not, however, make any finding regarding

equivalence. This is particularly significant in this case due to Plaintiff's diagnosed and undisputed morbid obesity. SSR 02-1p provides that at step three, obesity may be a factor in both "meets" and "equals" determinations. For example:

> We may also find that obesity, by itself, is a medically equivalent to a listed impairment. For example, if the obesity is of such a level that it results in an inability to ambulate effectively, as defined in sections 1.00B2b of the Listing, it may substitute for the major dysfunction of a joint with the involvement of one major peripheral weight-bearing joint in listings 1.02A or 101.02A, and we will then make a finding of medical equivalence.

> However, we will not make assumptions about the severity of functional effects of obesity combined with other impairments. Obesity in combination with another impairment may or may not increase the severity of functional limitations of the other impairment . . . .

Here the ALJ made no finding as to equivalence. He did find that "significant limitations on effective ambulation" were not present in this case, but does not further elaborate. 1.00 provides:

> To ambulate effectively, individuals must be capable of sustaining a reasonable walking pace over a sufficient distance to be able to carry out activities of daily living . . . . Therefore, examples of ineffective ambulation include, but are not limited to . . . the inability to walk a block at a reasonable pace on rough or uneven surfaces . . . the inability to carry out routine ambulatory activities such as shopping and banking, and the inability to climb a few steps at a reasonable pace with the use of a single hand rail. The ability to walk independently about one's home without the use of assistive devices does not in and of itself, constitute effective ambulation.

The undersigned finds the ALJ's explanation of Plaintiff's ability to ambulate effectively is insufficient under the Regulations. The undersigned therefore finds sufficient evidence does not support the ALJ's finding that Plaintiff does not meet or equal any listing.

## V. RECOMMENDED DECISION

For the reasons above stated, the undersigned finds that substantial evidence does not support the Commissioner's decision denying the Plaintiff's application for DIB, and accordingly

respectfully recommends that Defendant's Motion for Summary Judgment [Docket Entry 12] be **DENIED**; Plaintiff's Motion for Summary Judgment [Docket Entry 11] be **GRANTED in part**, by reversing the Commissioner's decision under sentence four of 42 U.S.C. §§ 405(g) and 1383(c)(3), with a remand of the cause to the Commissioner for further proceedings consistent and in accord with this Recommendation; and this case be dismissed and stricken from the Court's docket.

Any party may, within fourteen (14) days after being served with a copy of this Report and Recommendation, file with the Clerk of the Court written objections identifying the portions of the Report and Recommendation to which objection is made, and the basis for such objection. A copy of such objections should also be submitted to the Honorable John Preston Bailey, United States District Judge. Failure to timely file objections to the Report and Recommendation set forth above will result in waiver of the right to appeal from a judgment of this Court based upon such Report and Recommendation. 28 U.S.C. § 636(b)(1); <u>United States v. Schronce</u>, 727 F.2d 91 (4th Cir. 1984), <u>cert. denied</u>, 467 U.S. 1208 (1984); <u>Wright v. Collins</u>, 766 F.2d 841 (4th Cir. 1985); <u>Thomas v. Arn</u>, 474 U.S. 140 (1985).

The Clerk of the Court is directed to mail a copy of this Report and Recommendation to counsel of record.

Respectfully submitted this the 24th day of January, 2011.

s/ *John S. Kaull*
JOHN S. KAULL
UNITED STATES MAGISTRATE JUDGE